Karen M. Lerner
KIRBY McINERNEY LLP
250 Park Avenue, Suite 820
Tel.: (212) 371-6600

*Liaison Counsel for Plaintiff and the Proposed Class*

Anthony F. Fata
Jennifer W. Sprengel
Brian P. O'Connell
Kaitlin Naughton
CAFFERTY CLOBES MERIWETHER
& SPRENGEL LLP
150 S. Wacker, Suite 3000
Chicago, IL 60606
Tel.: 312-782-4880
Email: afata@caffertyclobes.com
jsprengel@caffertyclobes.com
boconnell@caffertyclobes.com
knaughton@caffertyclobes.com

*Counsel for Plaintiff and the Proposed Class*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| Port 22, LLC, on Behalf of Itself and All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>The Bank of Nova Scotia, Scotia Capital (USA) Inc., Scotiabanc Inc., Scotia Holdings (US) Inc., The Bank Of Nova Scotia Trust Company of New York, Corey Flaum, and JANE/JOHN DOES 1-50,<br><br>Defendants. | Case No. _____<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## COMPLAINT

Plaintiff Port 22, LLC ("Plaintiff"), individually and on behalf of itself and all those similarly situated, as defined below, brings this class action for damages and alleges as follows:

## NATURE OF THE ACTION

1.      This action arises from Defendants' manipulation of U.S. exchange-traded futures and options contracts involving metals (collectively, "Metals Contracts"), including contracts that trade primarily on exchanges owned by the CME Group, Inc. ("CME"). Defendants' manipulation occurred from at least January 1, 2008 through July 2016 (the "Class Period"). Defendants' manipulation constituted violations of the Commodity Exchange Act, 7 U.S.C. §§ 1, *et seq.* (the "CEA"), and common law.

2.      Defendants' manipulation occurred primarily or exclusively through the CME's electronic trading platform, called "Globex." The CME's Globex servers, matching engines and other instrumentalities are located in the Chicagoland area, including Chicago and Aurora. Data concerning Defendants' trades is stored by the CME and accessible by its Market Regulation Department, also located in Chicago.

3.      Plaintiff's allegations and claims are made on information and belief (except as to allegations specifically pertaining to Plaintiff, which are made on personal knowledge) based on the investigation conducted by and under the supervision of Plaintiff's counsel.  That investigation included reviewing and analyzing information concerning the Metals Contracts, which Plaintiff (through its counsel) obtained from, among other sources:  (1) reports about the markets; (2) publicly available press releases, news articles, and other media reports related to investigations into manipulation of Metals Contracts, among others; and (3) documents concerning Defendants' business practices made available through private civil litigation as well as formal investigations and enforcement proceedings, including by the DOJ and CFTC.

4.      Metal Contracts include precious metals such as gold, silver, platinum, palladium and base metals such as aluminum, copper and zinc. Metals Contracts are derivatives of the underlying, physical commodity. For example, the commodity underlying a silver futures contract is physical silver. A CME silver futures contract is "priced based on," i.e., derives its value from, an underlying 5,000 troy ounces of physical silver. If the price of silver changes, so does the value of the silver futures contract.

5.      Defendants manipulated Metal Contracts through "spoofing." Spoofing is generally defined as the placement of orders with the intent (at the time of placement) to cancel the orders before they are executed. The purpose of a spoof order is to move the market (the highest bid or the lowest offer or both) to a point where the trader's "real" or "genuine" orders are located.

6.      For example, assume a trader has a genuine bid (to buy) that is below the "inside"— or most competitive—bid (to buy). If the trader wanted to move the inside market down to her bid (to buy), the trader might place a large number of spoof offers (to sell). These spoof orders to sell would have the effect of signaling more supply, and exacting a downward pressure on prices. This downward pressure would lead some sellers to offer to sell at prices where the trader's genuine bid to buy is located. These sellers might enter an aggressive order to "hit" the trader's bid or enter a passive offer that crosses with the trader's bid. In either event, the trader has accomplished the objective of lowering the inside market down to where she wanted to buy. Once the genuine order is executed, the trader will then cancel the spoof orders.

7.      The unlawful conduct and manipulation described herein is the subject of numerous disclosed criminal and regulatory investigations.  On August 19, 2020 the Department of Justice announced a Deferred Prosecution Agreement ("DPA") with Scotia Bank and fined it $60.4 million for manipulating precious metal contracts. *See USA v. Bank of Nova Scotia*, CASE NO. 20-707 (MAS) (D.N.J.)

8. One of the traders, Defendant Corey Flaum of Delray Beach, Florida, pled guilty on July 25, 2019, to one count of attempted price manipulation in connection with his Metals Contracts trading at Scotiabank and another financial services firm, and his sentencing is scheduled for Jan. 27, 2021, before U.S. District Judge Brian M. Cogan of the Eastern District of New York. Also on July 25, 2019, Flaum settled charges with the Commodity Futures Trading Commission ("CFTC"). *See In the Matter of Corey D. Flaum*, Case No. 19-15 (CFTC July 25, 2019).

9. Also on August 19, 2020, the Commodity Futures Trading Commission fined Bank of Nova Scotia $127.4 million for spoofing precious metal contracts, as well as for making false statements to the Commission and for compliance violations. Bank of Nova Scotia was originally penalized $800,000 in on October 1, 2018 for spoofing gold and silver futures.

10. Given the concealed and secretive nature of Defendants' manipulation, more evidence supporting the allegations in this Complaint will be uncovered after a reasonable opportunity for discovery. Public information suggests that Defendants' manipulation was limited to precious metals contracts. Because trading in futures and options on the CME Globex platform is anonymous, Plaintiff cannot know whether Defendants' manipulation included other types of metals. Plaintiff reserves the right to amend the Class definition and allegations should it discover that Defendants engaged in spoofing with respect to other metals contracts.

## JURISDICTION AND VENUE

11. Gold, silver, platinum, and palladium are "commodities" and are the "commodities underlying" the futures and options contracts traded on the NYMEX and COMEX, as those terms are defined and used in Sections 1(a)(4) and 22 of the CEA, 7 U.S.C. §§ 1a(4) and 25(a)(1)(D), respectively.

12. The Court has subject matter jurisdiction over this action pursuant to 7 U.S.C. §§ 1331 and 1337.

13.     The Court has personal jurisdiction over Defendants pursuant to Section 22 of the CEA, as Defendants transact business in this District. Moreover, Defendants admitted that the conduct in the Information, which explains the basis of Plaintiff's injury, occurred in the "District of New Jersey, and elsewhere…."[1]

14.     Defendant Bank of Nova Scotia has also consented to this Court's personal jurisdiction on these facts when it explicitly consented to the filing of the Information in this District.

15.     Venue is proper in the District of New Jersey pursuant to 7 U.S.C. § 25(c) and 28 U.S.C. § 1391(b)(2), as Defendants admitted that the conduct alleged happened in this District and elsewhere. Furthermore, hearing the complaint in this venue would serve judicial economy as the Court is familiar with the facts, the underlying conduct, and the sophisticated subject matter of the complaint.

16.     Defendants made use of the means and instrumentalities of transportation or communication in, or the instrumentalities of, interstate commerce, or of the mails in connection with the unlawful acts and practices and courses of business alleged in this complaint.

17.     Defendants, directly and indirectly, made use of the means and instrumentalities of interstate commerce, or the instrumentalities of transportation or communication in interstate commerce, or of the mails in connection with the unlawful acts and practices and course of business alleged in this Complaint. Metals Contracts are commodities futures contracts that trade in interstate commerce in the United States.

## THE PARTIES

### I.     Plaintiff

18.     Plaintiff Port 22, LLC was at all relevant times an Illinois limited liability company with its principal place of business in Chicago, Illinois. It transacted in Metals Contracts during the Class

---

[1] *U.S. v. Flaum*, No. 19-338, ECF No. 1 ¶¶ 1, 10 (E.D.N.Y. 2019).

Period, including without limitation transactions involving Metals Contracts, including gold contracts, on the CME. Plaintiff was injured and suffered losses from trading in a market that was tainted by Defendants' conduct. Plaintiff traded at artificial prices proximately caused by Defendants' manipulation. Defendants spoofed the market for Metals Futures throughout the Class Period, which deprived Plaintiff and the Class of the ability to transact in a lawful market that was free of manipulation.

## II.    Defendants

19.    Defendant Bank of Nova Scotia, commonly known as Scotiabank, is a Canadian bank with its principal place of business in Toronto. It owns 100% the equity and voting interests in Defendants Scotia Capital (USA) Inc., Scotiabanc Inc., Scotia Holdings (US) Inc., Scotia Capital (USA) Inc., and The Bank of Nova Scotia Trust Company of New York.

20.    The Bank of Nova Scotia's U.S. core business lines include its Global Banking and Markets division, known as ScotiaMocatta. ScotiaMocatta "deals in precious and base metals trading, finance, and physical metal distribution." ScotiaMocatta operates as a business through The Bank of Nova Scotia New York Agency. ScotiaMocatta operates its precious metals wholesale services at 250 Vesey Street, 24th floor, New York, NY, 10281.

21.    Defendant Scotia Capital (USA) Inc. is a New York corporation and registered broker dealer in securities with the U.S. Securities and Exchange Commission, and member of the Financial Industry Regulatory Authority and New York Stock Exchange, with its principal place of business located at 1 Liberty Plaza, New York, NY 10006. Scotia Capital (USA) Inc. is a wholly-owned subsidiary of Scotia Capital Inc., which is a wholly-owned subsidiary of The Bank of Nova Scotia.

22.    Defendant Scotiabanc Inc. is a Delaware corporation with its principal place of business located at 711 Louisiana Street, Suite 1400, Houston, Texas 77002. Scotiabanc Inc. is a wholly owned subsidiary of Defendant Scotia Holdings (US) Inc.

23.     Defendant Scotia Holdings (US) Inc. is a Delaware corporation with its principal place of business located at 600 Peachtree Street NE, Atlanta, GA 30308-2219. Scotia Holdings (US) Inc. is a wholly-owned subsidiary of BNS Investments Inc. The sole common shareholder of BNS Investments Inc. is The Bank of Nova Scotia and the sole preferred shareholder is Scotia Ventures Limited, which is a wholly-owned subsidiary of The Bank of Nova Scotia.

24.     Defendant The Bank of Nova Scotia Trust Company Of New York is trust company regulated by the NYDFS and the Federal Reserve Bank of New York and a subsidiary of Scotia Holdings (US) Inc., with its principal place of business located at One Liberty Plaza, 165 Broadway, 26th Floor, New York, NY 10006.

25.     Defendants The Bank of Nova Scotia, Scotiabanc Inc., Scotia Holdings (US) Inc., Scotia Capital (USA) Inc., and The Bank of Nova Scotia Trust Company of New York are collectively referred to herein as "BNS."

26.     Defendant Corey Flaum was a BNS trader during the Class Period who engaged in the manipulation alleged herein, with others at BNS.

27.     Defendants Jane/John Doe 1-50 are persons and entities employed by or affiliated with Defendants or others that directly or indirectly inappropriately influenced or attempted to influence the trading and prices of Metals Contracts. The defined term "Defendants" also includes Jane/John Doe Defendants.

28.     During the Class Period, Defendants' subsidiaries or other affiliates of Defendants joined and furthered the manipulation of Metals Contracts, at artificial prices not reflecting fundamental supply and demand, to Defendants' direct benefit. The defined term "Defendants" also includes each Defendant's parent companies, subsidiaries, predecessors and successors, affiliates, agents, and employees.

29.     Whenever reference is made to any act of any corporation, the allegation means that the corporation engaged in the act by or through its directors, officers, employees, or agents while they were actively engaged in the management, direction, control, or transaction of the corporation's business or affairs.

30.     Each of the Defendants acted as the agent of, or participated in a joint venture for, the other Defendants with respect to the acts, violations and common course of conduct alleged herein.

## FACTUAL ALLEGATIONS

### I.     Relevant Factual Background

#### A.     Overview of Key Terms

31.     **Commodity Futures Contract.**  A commodity futures contract is a standardized bilateral executory agreement for the purchase and sale of a particular commodity at a specified price at a specified time in the future.  In the context of futures trading, a commodity is the underlying instrument upon which a futures contract is based.  The commodity underlying a futures contract can be a physical commodity, *e.g.* corn or silver, or a financial instrument, *e.g.* Precious Metals bills, foreign currencies, or the value of a stock index.  Pursuant to Section 5 of the CEA, 7 U.S.C. § 7, Designated Contract Markets ("DCMs") such as CME, CBOT, NYMEX, and COMEX specify the terms for each of the futures and options contracts they list, including the underlying commodity, trading units, price quotation, trading hours, trading months, minimum and maximum price fluctuation, and margin requirements.

32.     **"Long" and "Short" Futures.**  Futures contracts represent a commitment to make (in the case of a short contract) or take (long contracts) "delivery" of the underlying commodity at a defined point in the future.  Metals Futures are deliverable upon expiry. However, futures contracts can also be offset before expiration.

33.     **Offset by Trading.**  Futures market participants almost always "offset" their futures contracts before the expiration month when delivery or settlement occurs.  For example, a purchaser of one futures contract may liquidate, or cancel or offset, a future obligation to take delivery of the commodity underlying that contract by selling one equivalent futures contract.  This sale of one contract offsets or liquidates the earlier purchase of one contract.  The difference between the initial purchase price and the sale price represents the realized profit or loss for the trader.

34.     **Options Contract.**  An options contract is an agreement that gives the buyer, or "option holder," the right, but not the obligation, to either buy or sell something at a specified price during a specified time period.  The buyer of an option pays an "option premium" to the seller for the right to buy (call) or sell (put) the underlying commodity (in this case, Metals Futures).

35.     **Call Option.**  A call option confers upon the buyer the right, but not the obligation, to buy the commodity at the specified price (the "strike" price).  Call options confer upon the seller, or "option writer" the obligation to sell the commodity at the strike price.  The buyer (the "long" or "option holder") of one call option wants the value of the underlying commodity to increase so that the buyer can exercise the option at a price less than the underlying commodity is worth and make a profit.  The seller (person that is "short") of a call option wants to avoid having to sell the underlying commodity at a price below market value.  Therefore, a trader that purchases a call option will make money as the value of the underlying asset increases and lose money as it decreases.

36.     **Put Options.**  A put option confers upon the buyer the right, but not the obligation, to sell the underlying commodity at the strike price and confers upon the seller the obligation to buy the underlying commodity at the strike price if the option is exercised.  The buyer of one put contract, assuming no offsetting hedges, wants the value of the underlying commodity to decrease so that the buyer can sell the commodity at above a market price.  Conversely, the seller of the put option wants

the price of the underlying asset to stay above the strike price so that the seller of the option would not be forced to buy the underlying futures at an above-market price.

**B.    The CME Group**

37.    The CME Group Inc. ("CME Group") is one of the world's largest derivatives exchanges.  Its Global Headquarters is located at 20 South Wacker Drive, Chicago, Illinois 60606.  In 2007, the CME Group merged with the Chicago Board of Trade ("CBOT"), a DCM offering products subject to CBOT rules and regulations.  CBOT brought a suite of interest rates, agricultural, and equity index products to CME Group's existing offering.  Today, the CME Group is made up of four exchanges, CME, CBOT, NYMEX, and COMEX.  Each exchange offers a wide range of global benchmarks across major asset classes.

38.    The CME Group also owns and operates CME Globex, an electronic trading platform that is used to trade futures and options contracts.  Because CME Globex is an open access marketplace, it allows market participants to directly enter their own trades and participate in the trading process, including viewing the order book and real-time price data nearly 24 hours a day.  CME Globex is also subject to CME rules including those that (a) govern the conduct of CME Globex users and (b) provide for disciplinary sanctions including but not limited to exclusion from trading.  The platform is based in and utilizes computer servers in Chicago and Aurora, Illinois.

39.    CME Globex utilizes an electronic "Order Book" that displays quantities of anonymous orders or offers to sell futures contracts and bids to buy futures contracts at various price points or "levels."  An "order" is a request to buy (a "bid") or sell (an "offer" or "ask").  The highest price at which someone is willing to buy is referred to as the best-bid level, or first-bid level.  The best-ask level, or first-ask level, is the lowest price at which someone is willing to sell.  The bid-ask spread is the difference between these two prices.

40.     Quotes to buy or sell are entered into the Order Book, which allows market participants to see the number of orders and the total number of contracts that all traders are actively bidding or offering at a given price level.  The identities of traders who submit quotes into the Order Book are anonymous.  Thus, here for instance, market participants could not tell if Defendants serially placed and then cancelled orders on opposite sides of the market.

41.     Traders can view the aggregate resting contracts and orders up to the tenth-bid and tenth-ask levels.  This combined bid and ask information is often referred to as the visible order book and represents the visible market depth (an illustrative example of a visible order book is contained in FIGURE 1).  Traders use the information contained in the order book to make trading decisions.



| Price/ Level | Number of Orders to Buy | Number of Contracts Bid | Number of Orders to Sell | Number of Contracts Offered |
|---|---|---|---|---|
| 106.5 | | | 12 | 20 |
| 106 | | | 10 | 50 |
| 105.5 | | | 15 | 25 |
| 105 | | | 8 | 30 |
| 104 | | | 6 | 20 |
| 103.5 | | | 11 | 100 |
| 103 | | | 8 | 50 |
| 102 | | | 3 | 20 |
| 101.5 | | | 5 | 25 |
| 101 | | | 6 | 30 |
| | | | | |
| 99 | 6 | 50 | | |
| 98.5 | 10 | 20 | | |
| 98 | 14 | 100 | | |
| 97.5 | 8 | 25 | | |
| 97 | 6 | 25 | | |
| 96.5 | 12 | 30 | | |
| 95.5 | 4 | 50 | | |
| 95 | 7 | 40 | | |
| 94 | 5 | 20 | | |
| 94.5 | 7 | 15 | | |
| **TOTAL**: | 79 | 375 | 84 | 370 |

The "Tenth Offer Level." The CME's Order Book showed the first ten offer levels.

The "First Offer Level" or "First Ask Level" (*i.e.*, the lowest offer in the order book).

The "Spread" or "Bid/Ask Spread"

The "First Bid Level" (*i.e.*, the highest bid in the order book).

The "Tenth Bid Level." The CME's Order Book showed the first ten bid levels.

FIGURE 1.

42.     An "aggressive order" is an order that crosses the bid-ask spread, meaning the order is placed at a price where there is already a counterparty willing to take the other side of a trade, *i.e.*,

the order is placed at a price where another trader is already willing to transact. Practically speaking, an aggressive buy order would be placed at the first- offer level or higher; and an aggressive sell order would be placed at the first-bid level or lower. Accordingly, aggressive orders are guaranteed to execute, at least in part, immediately after being placed.

43. By contrast, a "passive order" does not give up the spread in price. On the buy side of the market, a passive buy order is placed at the best-price or lower, *i.e.*, it is an offer to buy at a price that is lower than the price that other traders are currently willing to sell. A passive sell order would be placed at the best-bid offer price or higher. Passive orders rest for at least some amount of time after being placed and are not guaranteed to execute.

44. CME Globex bids and offers for outright futures are typically matched according to an algorithm known as "FIFO," which stands for first-in, first-out. Under the FIFO order matching method, orders on the same side of the market (*i.e.*, the buy side or the sell side) and at the same price are filled based on time priority. Thus, as a general rule, the order that was placed first trades first, irrespective of the order's size. Iceberg orders are an exception; for iceberg orders, once the visible quantity is completely filled, the replenishment quantity goes to the back of the time priority queue. Iceberg orders refer to large single orders that are divided into smaller limit orders for the purpose of hiding the actual order quantity. The term "iceberg" comes from the fact that the visible lots are just the "tip of the iceberg" given the greater number of limit orders ready to be placed. In addition, futures contract spreads are matched based on an algorithm that takes into account the size of the orders among other criteria, with orders filled on a pro rata basis depending upon, among other things the size of the order, and with larger orders receiving a larger pro rata share, all else being equal.

## C. Overview of Precious Metals Contracts

45. As the CME explains, when most people hear the words precious metals, they think of jewelry or bullion. However, the precious metals market is more than just gold and silver. Other

precious group metals include platinum and palladium. These products can be used in jewelry, electronics, automotive manufacturing, and more. They can also be used to manage risk or to serve as a safe haven for capital during times of financial uncertainty.

46.     Futures contracts provide a mechanism to manage exposure to the underlying market. In the precious metal markets, the futures contracts offered by COMEX, NYMEX and others are a part of the wider global market for precious metals. They provide transparency and price discovery to the market. Options contracts on precious metal and precious metal futures are also offered by exchanges. Options contracts add to the range of trading and hedging strategies that can be employed by an investor.

47.     Precious Metals Contracts are traded on the COMEX, a CME-owned designated contract market under Section 5 of the CEA, 7 U.S.C. § 7. COMEX specifies the terms of trading for metals futures and options contracts, including the trading units, price quotation, trading hours, trading months, minimum and maximum price fluctuations and margin requirements.

48.     The commodity underlying each Metals Contract is physical metal. For example, a gold futures contract is "priced based on," i.e., it derives its value from, an underlying 100 ounces of physical gold. If the price of gold changes, so does the value of the COMEX gold futures contract. Silver, platinum, and palladium futures are similarly tied to the underlying metals.[2]

49.     Metals Contracts are deliverable upon expiration. Like other commodity futures contracts, a Metals Futures contract is a standardized agreement to buy or sell a commodity, such as gold, silver, platinum, or palladium, at a date in the future. In addition, Metals Contracts offer market participants the added security of reduced counterparty risk, insofar as CME faces every trade as its counterparty.

---

[2] Silver futures are traded in units of 5,000 ounces; platinum futures are traded in units of 50 ounces; palladium futures are traded in units of 100 ounces.

### D. The Mechanics of Spoofing

50.    The Metals Contracts market, like other futures markets, is susceptible to spoofing. "Spoofing" is a manipulative trading device used to create artificial prices in futures markets. Specially, the practice entails: (a) submitting or cancelling bids or offers to overload the quotations system of a registered entity; (b) submitting or cancelling bids or offers to delay another person's execution of trades; (c) submitting or cancelling multiple bids or offers to create an appearance of false market depth; or (d) submitting or canceling bids or offers with the intent to create artificial price movements upwards or downwards.[3]

51.    Spoofing works by using orders to create a false impression of supply or demand that impacts futures contract prices. For example, if a trader wants to buy at prices below the current inside market (i.e., the inside bid-ask spread), the trader will put in a primary or genuine order at that lower price level. To move the market down, the trader will then place one or more large orders— orders the trader never intends to execute—to *sell* a substantial amount of the same contract on the opposite side of the market. These orders are called the "spoof orders." Spoof orders are made at a price that is at or above the first-ask level (the lowest ask price available in the market), meaning that they are passive orders that will not be immediately filled. These large orders falsely signal that investors are selling their futures contracts, causing prices to decrease (in response to the apparent increase in supply), toward the price at which the trader entered the initial buy order. The manipulator cancels the large spoof orders before they get filled so the trader never enters a transaction at that price level.

52.    FIGURES 2a and 2b below show the order book imbalance that spoofing causes. FIGURE 2a is a hypothetical order book. The best bid is two ticks away from the best offer and,

---

[3] CFTC, Antidisruptive Practices Authority, Interpretive Guidance and Policy Statement, 78 Fed. Reg. 31890, 31896 (May 28, 2013).

therefore, no executable trades are present. For the purposes of this example, the order book begins fairly balanced, with roughly even numbers of contracts being offered and bid. FIGURE 2b shows that same hypothetical order book after a series of orders have been entered, namely an iceberg buy order is placed to buy 200 contracts, but only showing 12 contracts to the market at a time. Then, spoof orders are placed on the opposite side of the market: one order, placed with an order splitter, for 200 contracts is placed at the first offer level; an additional order for 100 contracts is also placed at the first offer level; and a third order for 250 contracts is placed, using an order splitter, at the second offer level. Following these spoof orders, the order book shows a significant imbalance, giving the appearance of far more sellers in the market than buyers, which signals artificial supply to market participants and leads to artificial, downward price pressure.

| Price/ Level | Number of Orders to Buy | Number of Contracts Bid | Number of Orders to Sell | Number of Contracts Offered |
|---|---|---|---|---|
| | | **Order Book Before the Spoofing Begins** | | |
| 105.5 | | | 15 | 187 |
| 104.5 | | | 8 | 94 |
| 104 | | | 12 | 144 |
| 103.5 | | | 14 | 269 |
| 103 | | | 6 | 87 |
| 102.5 | | | 11 | 124 |
| 101.5 | | | 10 | 356 |
| 101 | | | 11 | 243 |
| 100.5 | | | 19 | 312 |
| 100 | | | 15 | 428 |
| | | | | |
| 99 | 16 | 345 | | |
| 98.5 | 19 | 253 | | |
| 98 | 9 | 264 | | |
| 97.5 | 13 | 192 | | |
| 97 | 12 | 350 | | |
| 96.5 | 8 | 241 | | |
| 95.5 | 6 | 165 | | |
| 95 | 9 | 110 | | |
| 94 | 12 | 212 | | |
| 94.5 | 15 | 132 | | |
| **TOTAL**: | 119 | 2264 | 121 | 2244 |

FIGURE 2a.



FIGURE 2b.

53. The same technique can also be used in reverse to manipulate prices artificially higher. For example, a trader can place an order to sell futures contracts at well above the current market prices and then, by entering and canceling large orders to buy that same futures contract, send an artificial signal of increased demand to the market that drives futures prices higher towards the level of their initial sell order.

54. In each instance, the trader profits because spoofing allows the trader to buy futures contracts at below the current market price or to sell futures contracts at above the current market price. The CFTC has described spoofing as "a particularly pernicious example of bad actors seeking

to manipulate the market through the abuse of technology."[4]  James McDonald, CFTC's Director of

Enforcement, has remarked that:

> The advent of the electronic order book brought with it significant benefits to our markets—it increased information available, reduced friction in trading, and significantly enhanced the price discovery process.  But at the same time, this technological development has presented new opportunities for bad actors.  Just as the electronic order book increases information available to traders, it creates the possibility that false information injected into the order book could trick them into trading to benefit a bad actor.[5]

55.     Traders engaged in spoofing gain an unfair and unlawful advantage over other market

participants, hindering competition, undermining market integrity, and harming law-abiding victims.

And, as alleged here, Defendants' use of spoofing harmed Plaintiff and the Class members who

purchased or sold Metals Contracts at artificial prices during the Class Period.

## II.     Evidence of Defendants' Misconduct

### A.     BNS was an Active Participant in the Precious Metals Market

56.     Scotiabank was for years the world's biggest lender to the physical precious metals

industry, but it downsized the business in 2018 after failing to sell the operation. Throughout the Class

Period, BNS maintained an active presence in Metals Contracts by trading and, employing

approximately 140 people trading precious metals. In 2015, BNS had $10.55 billion in trading risk

exposed to precious metals.[6]

---

[4] *See* Press Release, CFTC, *Statement of CFTC Director of Enforcement James McDonald* (January 29, 2018), *available at*: https://www.cftc.gov/PressRoom/SpeechesTestimony/mcdonaldstatement012918 (last accessed Apr. 29, 2020).

[5] *See* Press Release, CFTC, *Statement of CFTC Director of Enforcement James McDonald* (Nov. 14, 2018), *available at*: https://www.cftc.gov/PressRoom/SpeechesTestimony/mcdonaldstatement012918 (last accessed Apr. 29, 2020).

[6] *See* BNS 2015 Annual Report at 84, available at https://www.scotiabank.com/ca/en/files/15/12/BNS_Annual_Report_-_2015.pdf.

## B.   Defendants' Manipulation of Metals Contracts

57.   Throughout the Class Period, Defendants spoofed the Metals Contracts market to illegally increase their trading profits, at the expense of Plaintiff and the Class.  By submitting and then withdrawing Deceptive Orders, Defendants were able to manipulate the Precious Metals Contracts markets.

58.   Market participants traded in what appeared to be a legitimate change in supply or demand.  Thus, Defendants' Deceptive Orders caused market participants to enter sell orders below, or buy orders above, the prevailing market price as a result of the manipulation.  Likewise, other market participants kept positions below or above what would otherwise have been the prevailing market price and quantity.

59.   After entering the Deceptive Orders, Defendants then cancelled the Deceptive Orders.  Simultaneously or soon thereafter, Defendants entered orders on the same instrument on the opposite side of the Deceptive Order.  This allowed Defendants to buy or sell Precious Metals Contracts from/to other market participants at artificially higher or lower prices than would have existed if not for the Deceptive Orders.

60.   Between approximately January 2008 and July 2016, at least four precious metals traders employed at BNS engaged in manipulative trading practices in connection with the purchase and sale of Metals Contracts. The four traders, who each acted independently, were (a) Corey Flaum, who was based in New York; (b) a "Trader 2", who was also based in New York; (c) a "Trader 3", who was based in London; (d) a "Trader 4",[7] who was based in New York until 2012, and thereafter was based in Hong Kong (collectively, the "Subject Traders").

61.   On thousands of occasions, the Subject Traders, principally Flaum, knowingly and intentionally attempted to manipulate the prices of Metals Contracts, and attempted to profit by falsely

---

[7] Traders 2, 3 and 4 remain unknown Jane/John Doe Defendants.

signaling the existence of genuine supply and demand for Metals Contracts. This conduct primarily involved gold and silver futures contracts, but the conduct of Flaum and Trader 4, at times, also involved platinum and palladium futures contracts.

62.     More specifically, the Subject Traders placed at least thousands of orders to buy and sell Metals Contracts with the intent to cancel those orders before execution (the "Manipulative Orders"). These Manipulative Orders were intended to artificially move the prices of Metals Contracts in a direction that was favorable to the Subject Traders, and to inject false and misleading information into the Metals Contracts markets in order to deceive other market participants into believing something untrue, namely that the visible order book accurately reflected market-based forces of supply and demand. This false and misleading information was intended to, and at times did, trick other market participants into reacting to the apparent change and imbalance in supply and demand by buying and selling futures contracts at quantities, prices, and times that they otherwise likely would not have traded.

63.     The Subject Traders had various techniques for placing Manipulative Orders. Often, a Manipulative Order took the form of a single, relatively large order in the top half of the visible order book that was canceled soon after its placement. As one example of this technique, on December 31, 2015, at approximately 11:39:10.679 a.m. (CST), Flaum placed a genuine order to sell five gold futures contracts at the price of $1,060.40. Approximately 82.987 seconds later, Flaum placed a Manipulative Order to buy 245 gold futures contracts at the price of $1,059.90 with the intent to create the illusion of demand, deceive other market participants, and artificially move the market price higher. One millisecond after Flaum placed the Manipulative Order to buy, the market price did in fact move higher, and Flaum's order to sell five gold futures contracts was executed in its entirety. Approximately 1.123 seconds later, Flaum canceled his Manipulative Order in its entirety.

64.     Similarly, on January 19, 2010, at approximately 8:34:52.193 a.m. (CST), Trader 2 placed a genuine order to sell two gold futures contracts at the price of $1,134.00. Trader 2 then placed a Manipulative Order to buy 110 gold futures contracts at the price of $1,133.80 with the intent to create the illusion of demand, deceive other market participants, and artificially move the market price higher. Three milliseconds after Trader 2 placed the Manipulative Order to buy, the market price did in fact move higher, and Trader 2's order to sell two gold futures contracts was executed in its entirety. Approximately 0.684 seconds later, Trader 2 canceled his Manipulative Order in its entirety.

65.     Further, on June 28, 2012, at approximately 6:15:29.111 a.m. (CST), Trader 3 placed a genuine iceberg order to sell three gold futures contracts at the price of $1,569.60. Trader 3 then placed a Manipulative Order to buy 150 gold futures contracts at the price of $1,569.00 with the intent to create the illusion of demand, deceive other market participants, and artificially move the market price higher. Twenty-one milliseconds after Trader 3 placed the Manipulative Order to buy, the market price did in fact move higher, and Trader 3's order to sell three gold futures contracts began to fill, and 43 milliseconds after Trader 3 placed the Manipulative Order, the order to sell was executed in its entirety. Approximately 2.805 seconds later, Trader 3 canceled his Manipulative Order in its entirety.

66.     One or more of the Subject Traders also sometimes placed Manipulative Orders that were outside the top half of the visible order book (i.e., more than five price levels away from the best bid or offer). For example, on May 25, 2016, at approximately 11:16:43.047 a.m. (CST), Flaum placed a genuine order to buy three gold futures contracts at the price of $1,222.50. Approximately 10.208 seconds later, Flaum placed a Manipulative Order to sell 145 gold futures contracts at the price of $1,223.20 (which at the time was in the bottom half of the order book) with the intent to create the illusion of supply, deceive other market participants, and artificially move the market price lower. Approximately 72 milliseconds later, the market price did in fact move lower, and Flaum's genuine

order to buy was filled in its entirety. Approximately 1.268 seconds later, Flaum canceled his Manipulative Order in its entirety.

67.     One or more of the Subject Traders also sometimes placed Manipulative Orders that lasted for a relatively long period of time. For example, on May 25, 2016, at approximately 11:26:42.919 a.m. (CST), Flaum placed a genuine order to buy ten gold futures contracts at the price of $1,221.70. Approximately 6.249 seconds later, Flaum placed a Manipulative Order to sell 145 gold futures contracts at the price of $1,222.20 with the intent to create the illusion of supply, deceive other market participants, and artificially move the market price lower. One millisecond after Flaum placed the Manipulative Order to sell, the market price did in fact move lower, and Flaum's order to buy ten gold futures contracts was executed in full. After the price continued to decrease, Flaum placed another genuine order to buy ten gold futures contracts at a price of $1,221.40. After that buy order was executed in full, Flaum canceled his Manipulative Order in its entirety. In total, the Manipulative Order was active for approximately 24.775 seconds.

68.     Further, on a few occasions, one or more of the Subject Traders placed Manipulative Orders that were intended to assist in the execution of genuine orders that were many price levels away on the opposite side of the market. For example, on August 22, 2011, at approximately 11:43:09.953 a.m. (CST), Flaum placed a Manipulative Order to buy 245 gold futures contracts at the price of $1,890.20 with the intent to create the illusion of demand, deceive other market participants, and artificially move the market price higher. On the opposite side of the market Flaum had a genuine order to sell 25 gold futures contracts at $1,891.00 (placed approximately 12.862 seconds before the Manipulative Order), and Flaum placed additional genuine sell orders during the life of the Manipulative Order. At the time of the Manipulative Order's placement, the genuine order to sell 25 contracts was 8 levels away from the Manipulative Order. Approximately 1.561 seconds after Flaum placed the Manipulative Order, the market price did in fact move higher, and the genuine order was

filled in its entirety. Approximately 1.870 seconds after the genuine order execution, Flaum canceled the Manipulative Order in its entirety.

69.     In addition, Flaum and Trader 4 sometimes layered, or grouped, multiple Manipulative Orders. In particular, Trader 4 placed groups of one-contract Manipulative Orders in close proximity to each other, typically opposite "iceberg" orders that Trader 4 intended to execute. For example, on August 1, 2013, at approximately 1:20:21.133 a.m. (CST), Trader 4 placed two iceberg orders to buy a total of ten gold futures contracts at the price of $1,320.00. Approximately 3.976 seconds later, Trader 4 began placing a series of one-contract Manipulative Orders to sell a total of 57 gold futures contracts at a price of $1,320.40 with the intent to create the illusion of supply, deceive other market participants, and artificially move the market price lower. Shortly thereafter, the market price began to drop, Trader 4's genuine orders to buy were filled in their entirety, and Trader 4 canceled his 57 Manipulative Orders. In total, the group of Manipulative Orders was active for approximately 14.909 seconds.

70.     The Manipulative Orders placed by the Subject Traders were transmitted electronically via international and interstate wire communications from outside the State of Illinois to computer servers operated by the CME Group in and around Chicago and Aurora, Illinois.

71.     In placing Manipulative Orders, the Subject Traders were acting within the scope of their employment as employees of the Company and with the intent, at least in part, to benefit the Company.

## CLASS ACTION ALLEGATIONS

72.     Plaintiff brings this action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of itself and all others similarly situated.  The "Class" is defined as:

> All persons or entities who transacted in gold, silver, platinum or palladium futures or options contracts on a domestic exchange during the period January 1, 2008 through July 2016 (the "Class Period").[8]

---

[8] As stated previously, Plaintiff reserves the right to amend the Class definition, including for purposes of identifying additional metals contracts.

73. Specifically excluded from the Class are Defendants and their co-conspirators; the officers, directors, or employees of any Defendant or co-conspirator; any entity in which any Defendant or co-conspirator has a controlling interest; and any affiliate, legal representative, heir, or assign of any Defendant or co-conspirator and any person acting on their behalf. Also excluded from the Class are the United States Government, any judicial officer presiding over this action and the members of their immediate family and judicial staff, and any juror assigned to this action.

74. The Class members are so numerous and geographically dispersed that joinder of all members is impracticable. There are at least hundreds of individuals or entities that purchased, sold, or held relevant Metals Contracts during the Class Period at prices artificially impacted by Defendants' wrongful conduct. While the exact number and identity of Class members is unknown to Plaintiff, this can be ascertained from readily available information.

75. Plaintiff's claims are typical of the claims of other Class members. Plaintiff and the members of the Class sustained damages arising out of Defendants' common course of conduct in the violations of law as complained of herein. The injuries and damages of each member of the Class were directly caused by Defendants' wrongful conduct in violation of the laws as alleged herein. No conflict between Plaintiff and the Class members exists.

76. Plaintiff will fairly and adequately protect the Class's interests. Plaintiff is represented by sophisticated, competent class action counsel, experienced in litigating complex class action litigation involving claims arising under the CEA. Defendants have acted in an unlawful manner on grounds generally applicable to all Class members.

77. The questions of law or of fact common to the claims of the Class predominate over any questions affecting only individual Class members, including legal and factual issues relating to liability and damages, such that certifying this case as a class action is superior to other available

methods for the fair and efficient adjudication of the controversy. Questions of law and fact common to all Class members, include, but are not limited to:

a. whether Defendants fixed, lowered, maintained, stabilized, and/or otherwise manipulated the prices of Metals Contracts;

b. the nature and duration of Defendants' manipulation of the prices of Metals Contracts;

c. whether manipulation of Precious Metals Securities prices injected artificial prices into Metals Contracts that traded on the CME;

d. whether Defendants participated in the Metals Contracts market;

e. whether Defendants' conduct violated Section 22 of the CEA;

f. whether Defendants' conduct acted to aid and abet CEA violations;

g. whether Defendants' unlawful conduct caused injury to the business or property of Plaintiff and the Class;

h. whether Defendants fraudulently concealed their misconduct from Plaintiff and the Class; and

i. the appropriate class-wide measure of relief for the Defendants' CEA violations.

78. Class action treatment is a superior method for the fair and efficient adjudication of the controversy, in that, among other things, such treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort, and expense that numerous individual actions would engender. The benefits of proceeding through the class mechanism, including providing injured persons or entities with a method for obtaining redress for claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in management of this class action.

79. The prosecution of separate actions by individual Class members would create a risk of inconsistent or varying adjudications, establishing incompatible standards of conduct for Defendants.

80. Plaintiff is unaware of any difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

## EQUITABLE TOLLING AND FRAUDULENT CONCEALMENT

81. During the Class Period, Defendants actively, fraudulently, and effectively concealed their collusion and manipulation of the Metals Contracts market.

82. Defendants concealed their manipulative acts by, *inter alia*, placing orders to buy or sell Metals Contracts at a certain price, even though they secretly had no intent of transacting at that level. Never did Defendants disclose that they placed these orders to manipulate the prices of those instruments. Because of such fraudulent concealment, and the fact that Defendants' manipulation is inherently self-concealing, Plaintiff and the Class could not have discovered Defendants' manipulation any earlier than the date of the public disclosures thereof.

83. As a result, Plaintiff and the Class had no knowledge of Defendants' unlawful and self-concealing manipulative acts and could not have discovered the same by the exercise of due diligence on or before October 1, 2018, when the CFTC fined BNS $800,000 for spoofing gold and silver futures. Plaintiff had no knowledge of Defendants' spoofing platinum and palladium futures until the CFTC Order against Flaum on July 25, 2019.

84. As a result of the concealment of Defendants' unlawful conduct, and the self-concealing nature of Defendants' manipulative acts, Plaintiff asserts the tolling of the applicable statute of limitations affecting the rights of the causes of action asserted by Plaintiff and the Class.

85. Defendants are equitably estopped from asserting that any otherwise applicable limitations period has run.

## FIRST CLAIM FOR RELIEF
### Manipulation of Metals Contracts
### in Violation of the Commodity Exchange Act
### (7 U.S.C. § 1, *et seq.* and Regulation 180.2)
### (Against All Defendants)

86.     Plaintiff incorporates the Complaint's allegations by reference and realleges them as though fully set forth herein.

87.     During the Class Period, Defendants intended to and did cause unlawful and artificial prices of Metals Contracts in violation of the CEA, 7 U.S.C. § 1, *et seq.*, through their use of fictitious buy and sell orders and other manipulative conduct.

88.     Defendants manipulated the price of a commodity in interstate commerce and/or for future delivery on or subject to the rules of any registered entity, in violation of the CEA.

89.     During the Class Period, the prices of Metals Contracts did not result from the legitimate market information and the forces of supply and demand.  Instead, the prices of Metals Contracts were artificially inflated, or deflated, by Defendants' spoofing and other manipulative trading activities.

90.     Throughout the Class Period, Defendants entered large orders to buy or sell without the intention of having those orders filled and specifically intending to cancel those orders prior to execution.  Defendants intended to inject false information about supply and demand into the marketplace and to artificially move prices up or down to suit Defendants' own trades and positions. As a result of these artificial prices, Plaintiff and the Class suffered losses on their trades in Metals Contracts.

91.     Defendants manipulated the prices of Metals Contracts throughout the Class Period, and thereby caused damages to Plaintiff and Class members who purchased or sold at these artificially inflated or deflated prices.

92. Defendants had the ability to cause and did cause artificial prices of Metals Contracts. Defendants, either directly and/or through their employees and/or affiliates, were active in the markets for Metals Contracts and were aware of the effects of spoofing on those markets.

93. Defendants' ability to cause artificial prices was enhanced through their use of algorithmic and HFT technology, which allowed them to place and cancel large spoof orders while avoiding having those orders filled.

94. By their intentional misconduct, Defendants each violated Sections 6(c), 6(d), 9(a), and 22(a) of the CEA, 7 U.S.C. §§ 9, 13b, 13(a), and 25(a), throughout the Class Period.

95. As a result of Defendants' unlawful conduct, Plaintiff and the Class have suffered damages and injury-in-fact due to artificial prices for Metals Contracts, to which Plaintiff and the Class would not have been subject but for Defendants' unlawful conduct.

96. Plaintiff and the Class are each entitled to actual damages sustained in Metals Contracts for the CEA violations alleged herein.

**SECOND CLAIM FOR RELIEF**
**For Employing a Manipulative and Deceptive Device in**
**Violation of the Commodity Exchange Act, As Amended**
**(7 U.S.C. §§ 1,** *et seq.* **and Rule 180.1(a))**
**(Against All Defendants, as to Transactions after August 15, 2011)**

97. Plaintiff incorporates the Complaint's allegations by reference and realleges them as though fully set forth herein.

98. Defendants' unlawful conduct, including the use of submitting and cancelling spoof orders and engaging in other manipulative conduct in order to artificially move prices for Metals Contracts, constitutes the employment of a manipulative and deceptive device.

99. Defendants acted intentionally—and, even if they are found to not have acted intentionally, then at least acted recklessly—in employing the manipulative and deceptive device to procure ill-gotten trading profits at the expense of Plaintiff and the Class. The risk that the

Defendants' spoof orders could mislead other market participants into believing there was genuine interest in purchasing or selling the specified number of contracts represented by the Defendants' spoof orders was so obvious that the Defendants must have been aware of it.

100.     Defendants knew that their spoof orders would appear in the Order Book and that traders often consider Order Book information in making trading decisions; thus, Defendants were, at least, reckless with respect to the danger that their spoof orders would mislead other market participants.

101.     Through their intentional misconduct, Defendants each violated Sections 6(c) and 22(a) of the CEA, 7 U.S.C. §§ 9 and 25(a), throughout the Class Period.

102.     As a result of Defendants' unlawful conduct, Plaintiff and the Class have suffered damages and injury-in-fact due to artificial prices for Metals Contracts and options on those futures contracts, to which Plaintiff and the Class would not have been subject but for Defendants' unlawful conduct.

103.     Plaintiff and the Class are each entitled to damages for the CEA violations alleged herein.

**THIRD CLAIM FOR RELIEF**
**Vicarious Liability in Violation of the**
**Commodity Exchange Act, As Amended**
**(7 U.S.C. §§ 1, _et seq._)**
**(Against All Defendants)**

104.     Plaintiff incorporates the Complaint's allegations by reference and realleges them as though fully set forth herein.

105.     Each Defendant is liable under Section 2(a)(1) of the CEA, 7 U.S.C. § 2(a)(1), for the manipulative acts of their agents, representatives, and/or other persons acting for them in the scope of their employment.

106.     Plaintiff and the Class are each entitled to damages for the CEA violations alleged herein.

## FOURTH CLAIM FOR RELIEF
### Unjust Enrichment
### (Against All Defendants)

107.     Plaintiff incorporates the Complaint's allegations by reference and realleges them as though fully set forth herein.

108.     Defendants financially benefited from their unlawful acts.  As alleged herein, Defendants submitted spoof orders and employed other techniques to manipulate the prices of precious Metals Contracts in an artificial direction.  Defendants intended to, and did, artificially alter prices in a direction that benefitted their trades and positions, at Plaintiff's and the Class' expense.

109.     It would be inequitable for Defendants to be allowed to retain the benefits, which Defendants obtained from their illegal manipulative acts and other unlawful conduct at Plaintiff's and the Class' expense.

110.     Plaintiff and the Class are entitled to the establishment of a constructive trust impressed upon the benefits to Defendants from their unjust enrichment and inequitable conduct.

111.     In addition, each Defendant should pay restitution of its own unjust enrichment to Plaintiff and the Class.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief as follows:

(A)     For an order certifying this lawsuit as a class action pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure, and designating Plaintiff as the Class representatives and its counsel as Class Counsel;

(B)     For a judgment awarding Plaintiff and the Class actual damages for Defendants' CEA violations, together with pre- and post-judgment interest at the maximum rate allowable by law;

(C)     For a judgment awarding Plaintiff and the Class exemplary or punitive damages arising from Defendants' CEA violations.

(D)     For a constructive trust and disgorgement of ill-gotten profits flowing from Defendants' manipulative conduct;

(E)     For an award to Plaintiff and the Class of their costs of suit, including reasonable attorneys' and experts' fees and expenses; and

(F)     For such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a jury trial as to all issues.

Dated: September 21, 2020                 Respectfully submitted,

By:     */s/ Karen M. Lerner*
Karen M. Lerner
**KIRBY McINERNEY LLP**
250 Park Avenue
Suite 820
Tel.: (212) 371-6600
Email: klerner@kmllp.com

*Liaison Counsel for Plaintiff and*
*the Proposed Class*

Anthony F. Fata
Jennifer W. Sprengel
Brian P. O'Connell
Kaitlin Naughton
**CAFFERTY CLOBES MERIWETHER**
**& SPRENGEL LLP**
150 S. Wacker, Suite 3000
Chicago, IL 60606
Tel.: 312-782-4880
Email: afata@caffertyclobes.com
jsprengel@caffertyclobes.com
boconnell@caffertyclobes.com
knaughton@caffertyclobes.com

*Counsel for Plaintiff and the Proposed Class*